IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

EZRA JOE JONES                                                                                    PLAINTIFF

v.                                    Civil No. 09-5044

SHERIFF TIM HELDER,
ET AL.                                                                                            DEFENDANTS

### MEMORANDUM OPINION

Plaintiff, Ezra Joe Jones (hereinafter Jones), filed this civil rights action pursuant to the provisions of 42 U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis*. The case is before me pursuant to the consent of the parties (Doc. 63).

Jones is currently incarcerated in the Texarkana Regional Correction Center, a unit of the Arkansas Department of Correction (ADC) in Texarkana, Arkansas. The events at issue in this lawsuit occurred while Jones was incarcerated at the Washington County Detention Center (WCDC) on four separate occasions from January of 2008 to April 2009. Jones maintains the Defendants violated his constitutional rights by failing to provide him with an adequate diet.

Jones initially also asserted a claim that the grievance procedure at the WCDC was inadequate. On March 29, 2011, an order was entered (Doc. 61) dismissing Plaintiff's claims regarding the grievance procedure and his claims for compensatory damages.

A second summary judgment motion has been filed on behalf of ARAMARK Correction Services, LLC (hereinafter ARAMARK), Steve Pennington, Sonia Jennings, Leela Williams, Michael Word, and Kate Finn (Doc. 77). A second summary judgment motion has also been filed by Sheriff Tim Helder (Doc. 80). Plaintiff filed a partial response (Doc. 84). On

-1-

AO72A
(Rev. 8/82)

December 5, 2011, a telephonic hearing was held on the motions and Plaintiff was asked to respond, under oath, to the statements of fact filed by the Defendants and given an opportunity to provide any additional testimony regarding his claims. The motions are now ready for decision.

**1. Background**

The parties agree that Jones was incarcerated at the WCDC on four separate occasions: January 6, 2008 to April 14, 2008; June 7, 2008, to August 5, 2008; October 2, 2008, to October 5, 2008; and December 8, 2008, to April 6, 2009. Each time Jones was booked or released his weight was recorded. With the exception of the December 8th booking, Jones agrees that his weight was accurately recorded. At booking on January 6, 2008, his weight was 166. Helder Affidavit (Doc. 82-1) Exhibit A. At release on April 14th, his weight was 164. Id. at Exhibit B. At booking on June 7th, his weight was 159. Id. at Exhibit C. At release on August 5th, his weight was 162. Id. at Exhibit D. At booking on October 2nd, his weight was 159. Id. at Exhibit E. At release on October 5th, his weight was 159. Id. at Exhibit F.

At booking on December 8th, Jones' weight was recorded as 146. Id. at Exhibit G. Jones, however, believes his weight was approximately 160. At release on April 6, 2009, his weight was recorded as 174. Id. at Exhibit H. Jones believes his weight was approximately 167. In either case, Jones gained weight during this incarceration.

ARAMARK is a private food service provider under contract, during the relevant time period, to provide meals to the inmates at the WCDC. Sonia Jennings Affidavit (Doc. 78-2) at ¶ 2. The menus, approved by both WCDC personnel and a licensed dietician for ARAMARK, are designed to provide a weekly average of 3000 calories a day. Helder Aff. (Doc. 82-1) at

Exhibit I. Because of reduced portion sizes, Jones maintains he was not provided with an average of 3000 calories a day.

The state standards require inmates to be provided with 2300 calories a day. Helder Aff. at ¶ 12. Four menus, used on a rotating basis, were approved for the relevant time frame. Id. at ¶ 13.

On a daily basis, WCDC personnel notified ARAMARK of the inmate count for the day. Steve Pennington Affidavit (Doc. 78-1) at ¶ 6. The number of meals needed was then entered into a computer using software that calculated the types and amounts of food required to prepare the three meals that day. Id. at ¶ 7.

The information was printed out and provided to ARAMARK employees who removed the necessary food products, including condiments and spices, from storage. Pennington Aff. at ¶ 9. Trustees, continually monitored by ARAMARK employees, prepared and served the meals. Id. at ¶¶ 10-12. Portion control utensils were used for serving each food item. Id. at ¶ 13. For example, if the menu called for ten ounces of mashed potatoes, a ten ounce ladle, along with a tool to scrape the top of the ladle, was used to serve the potatoes. Id. According to Pennington, the "procedures in place did not allow for judgment or discretion on the part of the trustees in serving the food." Id. While variations to the menus were made in the case of inmates on special diets, Jones testified he was not on any type of special diet.

According to Sheriff Helder, a control tray is prepared at every meal and is retained for an unspecified number of days. Helder Aff. at ¶ 14. He asserted that the control tray showed the correct portion sizes of food served with every meal. Id. In the event an inmate or jailer has a question about portion size, the tray in question may be compared to the control tray. Id. Sheriff

AO72A
(Rev. 8/82)

Helder indicated that jailers are instructed to inspect the trays for any obvious mistakes when the trays are passed out. Id. at ¶ 15. Additionally, Sheriff Helder stated the jailers have been instructed that there is a control tray to compare the tray with if it is needed. Id.

While Jones agreed that the menus were dietician approved and the food was prepared under sanitary conditions, he maintained that the portions served were less than the portion sizes specified on the menus. Jones testified that on a couple of occasions, he measured the portion size of various food items by utilizing an empty eight ounce milk carton. The remaining time he just "eyeballed" the portion size. He estimated that the meals actually served contained approximately sixty percent of the amount listed on the menus. Jones believed too little food was purchased to prepare the meals with the portion sizes contained on the menus. Finally, Jones maintained that inmates were served too few vegetables.

When he complained, Jones testified the stock answer was "that was what ARAMARK sent up." Jones testified that when he was passing out trays, if one did not contain the correct amount of food, he was told to just hand it out.

With respect to the control trays, Jones stated the trays did not contain the correct portion size of the various food items. Instead, he maintained the trays contained very small amounts of the food served at each meal. The trays were kept for approximately one week. According to Jones, if someone complained of food poisoning, the food on the control tray could be tested.

In March of 2009, Jones became a trustee for approximately one month. For one to two weeks, he worked in the kitchen assisting with the preparation and serving of the meals. During this time, Jones testified he observed trustees: using incorrect portion size utensils; not filling the utensils completely; and failing to ensure that all measured food was actually served by

AO72A
(Rev. 8/82)

leaving food in, or on, the serving utensils. Jones indicates that ARAMARK kitchen supervisors, Leela Williams and another woman, were present when the trays were made, handed out the serving utensils, and stood next to the trustees while the trays were prepared.

Jones testified that the trustees were allowed to eat any leftover food. He believed this contributed to their "sloppiness" in connection with the portion size. Furthermore, if the computer calculated the exact amount of food needed to feed the inmates each day, he maintains there would not be any leftovers.

During the month he was a trustee, Jones testified he had plenty of food since he was allowed to eat leftovers. He indicated he was eating "triple" trays. Trustees were the only inmates allowed more than one tray per meal.

During the other eight months he was incarcerated at the WCDC, Jones testified he maintained his weight by supplementing his diet with commissary food.[1] In fact, he indicated he spent about $500 on commissary, which consisted only of "junk food" such as Ramen Noodles, chips, and candy.

Jones testified a couple of times a week he suffered diarrhea; he suffered from sore muscles and joint pain from approximately one week after each booking until one week after his release; and he had migraines four or five times a week. He blamed these physical ailments on improper nutrition. He did not seek medical attention because he had seen inmates with more serious medical complaints being denied medical care. In between incarcerations and after he was transferred to the ADC, Jones testified he ate well and did not need medical attention. In

---

[1] The availability of supplementary food from the commissary cannot "be considered part of the jail diet for purposes of determining its constitutionality because some of the inmates have no money to purchase these items. Moreover, the state is under a duty to provide an adequate diet for all inmates." Campbell v. Cauthron, 623 F.2d 503, 508 (8th Cir. 1980)(internal quotation marks and citations omitted).

AO72A
(Rev. 8/82)

between incarcerations, Jones lived with his mother and cooked healthy meals for himself using produce from their garden.

### 2. Applicable Standard

"Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We view all evidence and inferences in a light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). However, the nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a genuine issue for trial. See Celotex v. Catrett, 477 U.S. 317, 324 (1986).

### 3. Arguments of the Parties

Sheriff Helder first argues that the meals adopted were nutritional and exceeded, by 700 calories, the state mandated 2300 calorie a day diet. He maintains there is no evidence of deliberate indifference on his part. Even if smaller portions were served than called for on the menu, Sheriff Helder states the 700 calories above the state standard provided an adequate cushion.

The ARAMARK Defendants first argue there is no evidence they deprived Jones of an adequate diet. Next, they argue that there is no evidence that they were personally involved in any alleged misconduct. Finally, they argue there is simply no evidence to support an entitlement to punitive damages.

In opposition, Jones maintains that the meals actually served did not provide a diet sufficient to maintain his health. He asserts portion control was virtually non-existent and the

food was nutritionally inadequate. While he sought no medical care, Jones asserts his health was impacted in several ways including diarrhea, joint pain, sore muscles, and migraines.

### 4. Discussion

The Eighth Amendment requires inmates to be provided with "nutritionally adequate food." Wishon v. Gammon, 978 F.2d 446, 449 (8th Cir. 1992). Failure to provide adequate nutrition can constitute deliberate indifference. Id.; see also Hartsfield v. Colburn, 491 F.3d 394, 396 (8th Cir. 2007)(Deliberate indifference is the appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate food, clothing, shelter, medical care, and reasonable safety). "Deliberate indifference is equivalent to criminal-law recklessness, which is more blameworthy than negligence, yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate. An obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to an inmate." Schaub v. VonWald, 638 F.3d 905, 914-15 (8th Cir. 2011)(internal quotation marks and citations omitted).

"The deprivation of food constitutes cruel and unusual punishment [within the meaning of the Eighth Amendment] only if it denies a prisoner the minimal civilized measure of life's necessities." Berry v. Brady, 192 F.3d 504, 507 (5th Cir. 1993)(internal quotation marks and citations omitted).

> To prevail on an Eighth Amendment claim, an inmate must prove both an objective and a subjective element. First, the alleged deprivation, objectively, must be sufficiently serious; the prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities; or the prison official must incarcerate the inmate under conditions posing a substantial risk of serious harm. Second, the prison official, subjectively, must act with deliberate indifference to inmate health or safety.

Simmons v. Cook, 154 F.3d 805, 807 (8th Cir. 1998)(internal quotation marks and citations omitted).

I find no evidence of deliberate indifference on the Defendants' part. Menus certified by a licensed dietician were adopted and approved by personnel of both the WCDC and ARAMARK. The menus adopted provided an average of 3000 calories per day; exceeded state requirements by 700 calories per day; and, specific utensils were utilized to ensure accurate portion size and to ensure consistency between trays. The menus demonstrate that inmates received a variety of foods including protein in the form of meat or eggs, grains, fresh or canned fruit, fresh or canned vegetables, and dairy products.

Jones maintains he only received sixty percent of the food specified in the menu. Presumably this reduced his caloric intake to approximately 1800 calories per day. There is no evidence that any of the named Defendants knew that reduced portions were served on a regular basis or that Jones, or any other inmate, faced a substantial risk of serious harm from the lack of more stringent portion control oversight. Further, Jones testified that an adequate diet could consist of less than 2300 calories per day depending on the nutritional content of the food served. While Jones maintains his health suffered as a result of the diet he received, he presents no evidence to support this assertion nor did he seek medical attention. The meals Jones was served undoubtedly varied from what he ate when he was not incarcerated; however, this fact does not equate to a constitutional violation. See e.g., Burgin v. Nix, 899 F.2d 733, 734-35 (8th Cir. 1990)(inmates do not have a right to be served a particular type of food). On the record before me, I cannot say there is a genuine issue of material fact as to whether the diet Jones was served was so nutritionally deficient so as to constitute an inadequate diet. There is simply no evidence

AO72A
(Rev. 8/82)

to suggest the Defendants acted with deliberate indifference to Jones' right to receive reasonably adequate food.

### 5. Conclusion

For the reasons stated, by separate order the motions for summary judgment (Doc. 77 & Doc. 80) will be granted and the case dismissed with prejudice.

DATED this 9th day of December 2011.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE